```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  SHUZHONG BAO, et al.,
 4                          Plaintiffs,
 5                                      19 cv 08062(AEK)
        -vs-
 6                                   BENCH TRIAL
 7
    XUGUANG WANG, also known as JASON WANG,
 8  et al.,
 9                          Defendants.
10  ------------------------------------x
11                              United States Courthouse
                                White Plains, New York
12                              March 16, 2022
                                VOLUME I
13
14
    Before:  THE HONORABLE ANDREW E. KRAUSE, Magistrate Judge
15
16                      APPEARANCES
17  LI HAN
         Attorney for Plaintiffs
18
    CURT DONALD SCHMIDT
19       Attorney for Plaintiffs
20  STONE MANDIA, LLC
         Attorneys for Defendants
21  RICHARD B. STONE
22  Also present:  LIANQUN WANG, Chinese Interpreter
23
24
25
```

```
 1              (Trial resumed)

 2              THE DEPUTY CLERK:  All rise.

 3              THE COURT:  Good morning, everybody.  Please be

 4  seated.

 5              MR. STONE:  Your Honor, may I get a chair for the

 6  interpreter?

 7              THE COURT:  Yes, absolutely.

 8              Okay.  I hope everybody had a good evening.

 9              Mr. Stone, I did see your letter or memo this morning.

10  Thank you for that.  You could have done that in less space, but

11  I appreciate -- I appreciate the thorough treatment of the

12  issue.

13              MR. STONE:  You don't think I did that, do you?

14              THE COURT:  No.  But I appreciate your office's

15  thorough treatment of the issue, put it that way.

16              MR. STONE:  And you can tell from the last paragraph

17  that the scrivener was not very happy with the conclusion of the

18  Court.  She thought that the conclusion was -- she told me it

19  was reprehensible.  I said, you know I have to answer for that.

20              THE COURT:  Well, we all have to make do sometimes.

21              MR. STONE:  It was an interesting issue as it

22  developed.

23              THE COURT:  Absolutely.  Okay.  Mr. Schmidt?

24              MR. SCHMIDT:  Your Honor, if I may?

25              THE COURT:  Yes.
```

 1          MR. SCHMIDT:  Good morning.  So I just wanted to

 2  confirm, I did speak on the telephone last night with Mr. Stone.

 3  He conceded to me that what I said in the court yesterday and

 4  what he suggested to the Court yesterday was accurate; that both

 5  New York and New Jersey are states where only one party needs to

 6  be aware of a telephone being recorded in order to make that

 7  activity legal; and therefore, there is no issue regarding the

 8  legality of that particular exhibit.

 9          THE COURT:  Correct.

10          MR. SCHMIDT:  I was prepared -- I did not write a

11  letter.  I was not aware that Mr. Stone was planning to write a

12  letter, to be honest.

13          THE COURT:  I just received it this morning.

14          Mr. Stone, you will provide a copy of it to Mr.

15  Schmidt.

16          MR. SCHMIDT:  And the one other thing I would say, I

17  think it's unfortunate that there were gratuitous insults in the

18  letter, and I object to that.

19          THE COURT:  Okay.  Noted.  I mean, at the end of the

20  day, the evidence is in, and the law is clear as to the legality

21  of the recording.  So to the extent there was any question on

22  the record about that yesterday, as we were all sort of working

23  through it in real time together, there is no longer any

24  question about that.  And as far as characterizations in the

25  letter, I wouldn't give that too much additional thought,

1   Mr. Schmidt.

2          MR. SCHMIDT:  Yes.  Thank you, Judge.

3          THE COURT:  Okay.  With all that said, Mr. Stone,

4   please call your witness.

5          Mr. Wang, I am going to ask you to stand up so you can

6   be sworn in.

7          But just as a formality, Mr. Stone, please call your

8   witness.

9          MR. STONE:  Okay.  I will call my first witness in the

10  defense case, Mr. Jason Wang, one of the defendants, Your Honor.

11         THE COURT:  Thank you, Mr. Stone.

12         And, Mr. Wang, please raise your right hand so that

13  Ms. Brown can administer the oath.

14  XUGUANG WANG, having been duly sworn, testified as follows:

15         THE DEPUTY CLERK:  Please spell your first and last

16  name slowly and clearly for the record.

17         THE WITNESS:  First name, Xuguang, X-U-G-U-A-N-G.

18  Last name, W-A-N-G, Jason Xuguang Wang.

19         THE COURT:  Thank you, Mr. Wang.  You can sit down,

20  and will you please remove your mask if you're comfortable doing

21  that?  And just pull the microphone down towards you a little

22  bit.  Perfect.

23         All right.  Mr. Stone, when you're ready.

24         MR. STONE:  Judge, just to reiterate, I am going to

25  start in English, see how it goes.  If anybody finds it

1  difficult, including Mr. Wang, then of course the interpreter is

2  here.

3          THE COURT:  Understood.

4          MR. STONE:  Okay.

5          THE COURT:  Yes.

6  DIRECT EXAMINATION

7  BY MR. STONE:

8  Q.  Good morning, Mr. Wang.

9  A.  Thank you.

10  Q.  Is your microphone on?

11  A.  Yes.

12          MR. STONE:  All right.  Is it on, Judge?

13          THE COURT:  Yes.

14  Q.  Could you tell us where you live?

15  A.  I live in New Jersey.  City name called Upper Saddle River,

16  address 11 Iron Latch Court, spelled I-R-O-N-L-A-T-C-H Court,

17  C-T.

18  Q.  And I take it you are married; is that correct?

19  A.  Yes.

20  Q.  And your wife's name?

21  A.  Yifen Bao.  She is there.

22  Q.  Do you have children?

23  A.  Yeah.  I have three girls.

24  Q.  And their names and ages?

25  A.  Oldest one was called Juihei, J-U-I-H-E-I, last name Wang.

1  They live in Seattle.

2  Q.   And the next one?

3  A.   Next one is Zoe Wang.  Yeah, on the --

4  Q.   She is a defendant in the case?

5  A.   Zoe Wang, who was here yesterday.

6        THE COURT:  One second, Mr. Stone, you just have to

7  let him speak so we are not having two people speaking at once.

8        THE WITNESS:  And the little one called Jolie,

9  J-O-L-I-E, last name Wang is in the school.

10  Q.   Okay.  What is your relationship to the plaintiffs in this

11  case?

12  A.   Shuzhong Bao is my brother-in-law.  That means he is my

13  wife's younger brother.

14  Q.   And his wife?

15  A.   The wife called Zeng Bibo.

16  Q.   And their children are your nieces?

17  A.   Yes.

18  Q.   Now, how long have you known Mr. Bao and your

19  sister-in-law?

20  A.   Since I married with my wife.  I was my wife -- she is only

21  17 so -- hold on -- for 30, 35 years.  Then I know the little

22  brother.

23  Q.   Are you a citizen of the United States?

24  A.   Yes, sir.  Yes, I am.

25  Q.   And how long have you been living in the United States?

1  A.    '92, I want to -- about 30, 30, 29, 30.

2  Q.    And can you tell the Court what your business or occupation

3  is?

4  A.    Yes.  I am a -- what I can say -- is the restaurant

5  operator.  If I want to start again, I wouldn't do that.

6  Q.    Over the course of decades, how many restaurants have you

7  been involved with?

8  A.    A lot.  One, two -- one, two, three, four, I think around

9  like ten.

10 Q.    Okay.  Are you operating a restaurant now?

11 A.    Yes.  I still got three restaurants.

12 Q.    And can you tell us their locations?

13 A.    First one is on the New Jersey, Randolph, Randolph, New

14 Jersey.  That's Italian restaurant, a famous Italian restaurant.

15 Another one is in West Milford, New Jersey.  It was the Italian

16 restaurant.  After Covid, I have to change to a Japanese

17 restaurant.  Doing pretty good.  Another one is -- another two,

18 actually, was called Freelance Cafe, and another one was called

19 Xaviars.  Actually, I bought this restaurant is really famous.

20 Peter Kelly -- I think a lot of people know Peter Kelly -- Peter

21 Kelly had two famous restaurant, best restaurants in Hudson

22 Valley.

23 Q.    And you bought them as well?

24 A.    Yeah, I bought that.  Then during the operating didn't go

25 successful.  I closed one.  Then I -- right now I am good.  I am

1  leasing to some men that people going to open a Japanese

2  restaurant, yeah.  We do well.

3  Q.   What about Piermont?

4  A.   Yeah.  Piermont just has two restaurants.  One -- Piermont

5  one cafe is Piermont Cafe.  One called Xaviars, both owned by

6  Kelly, Peter Kelly.  Then it was during --

7            THE COURT:  Just to be clear.  That's Peter Kelly,

8  K-E-L-L-Y?

9            THE WITNESS:  Yes.

10            THE COURT:  Okay.

11            THE WITNESS:  I think it's famous chef in the state of

12  the country.  Then because I am not -- how I say operating just

13  now, right, the restaurant didn't go well.  We start from $3

14  million sales all the way down to $400.  Then plus, then I go to

15  the Covid, I re-management, we are doing a lot better.

16            THE COURT:  So in Piermont you have still Freelance

17  Cafe?

18            THE WITNESS:  Yeah, I still have.

19            THE COURT:  And then Xaviars is closed, and you are

20  going to lease it to somebody else, and they are going to run a

21  Japanese restaurant?

22            THE WITNESS:  Yes.  We did a background check.  They

23  were very successful, the people.  The name is called Wasabi.

24  In this area a lot of people know the Wasabi.  He is going to

25  coming in.  Actually, looked the books.  So far, we are pretty

1   good.

2           THE COURT:  The Wasabi, has it opened yet or not?

3           THE WITNESS:  Just pre-Covid did the owner background

4   check.  Yeah, he is still waiting to join his career.  It's a

5   very nice restaurant.

6           THE COURT:  You said he's waiting to join what?

7           THE WITNESS:  To join inside the lease.

8           THE COURT:  Okay.

9           THE WITNESS:  Yes.  And very, very nice decor.

10  Everybody new, and Piermont is a very nice area.  Restaurant we

11  looking for high income, good people, right?  That's the all we

12  have.  So yes, I think due to the Covid, difficult time we do --

13  I'm going to say very well.  Is good.

14          THE COURT:  Okay.

15          THE WITNESS:  I keep all the employees.  The employees

16  working there for 30 years.  Some people coming for 16.  Right

17  now 46.  They are still there.  We are a family.  We don't have

18  fight with anybody.

19          THE COURT:  Okay.  Mr. Wang, here is what I am just

20  going to ask you to do.  I appreciate all of what you just said,

21  and that's helpful background.  Mr. Stone is going to ask you

22  questions, and I will just ask you to keep your answers nice and

23  short, and if he wants to ask you to elaborate, he will ask you

24  more questions.

25          THE WITNESS:  Okay.

```
 1              THE COURT:  Mr. Stone?
 2 Q.   Now, your relationship with your brother-in-law and
 3 sister-in-law, prior to this dispute, how did you get along with
 4 the two of them?
 5 A.   I was -- there is two things:  One is the management,
 6 management issues, but down to the core, then we put it on the
 7 side working to -- everything is evidenced by the paperwork.
 8 Everything is by the -- not I am say, not another party say.  We
 9 have to see others choose, where to choose.
10              THE COURT:  Okay.  Hold on.  Mr. Wang, the question
11 was:  Before any of this started with the investments and the
12 restaurants, before 2006, how was your relationship with Mr. Bao
13 and Ms. Zeng?
14              THE WITNESS:  Actually, very good.
15              THE COURT:  Okay.  Next question.
16 Q.   Over the course of the decades before, did you not only get
17 along with them, but did you participate in family events and
18 all of those things?
19 A.   Yeah.  I am honestly all the time, yes, we have because I
20 am in U.S.  They are in China.  We do have some holidays, but I
21 want to say is very time managing.
22 Q.   Were there times when your children went to China either to
23 study or to visit where they stayed with the Baos?
24 A.   No.  Stay with -- my daughter is NYU.  She could do study
25 in China.  Still in school now.  Maybe Sunday we can go to
```

1  grandmom's house, like my wife's mom, father's house.  They

2  never stay with his brother and the uncle and aunt.

3  Q.   Early on, there was some discussion about this, did you

4  participate in some investment together with Mr. Bao in the

5  state of Washington?

6  A.   Yes.  That's -- yes, we talk about.  I want to tell the --

7  I want to tell three things:  I was bought the bank house in

8  Seattle, Washington becoming reception.  I bought a house.  Then

9  I buy another house on the deal.  I don't know what reason,

10 maybe I say, maybe his sister say, but I don't know exactly, but

11 he interested in house.  I already had a contract.  He said he

12 wanted to buy it, but he told his sister he doesn't have money.

13      Then by the time my daughter leaves Shanghai, is studying,

14 then I thought maybe I needed some help from uncle, you know,

15 his mom is a grandma.  His dad sometimes need the

16 transportation.  I said okay, just to get the deal.  Let him do

17 it.  He doesn't have money.  I loan him money to him; let him

18 buy.  He bought the house because the house is bank-owned.

19 After I bought the house, I clean it out, manage it for three

20 years.  Successful sold out.  He make a $200,000.  I'm not going

21 to say, I am not a money, greedy people.  $200,000 to him, but I

22 want everybody to understand that investments sometimes can make

23 money; some can be losing money.  Making money the key.  You

24 bought the place.  You have care, managing, organize all things.

25 They can make money.

1      For the three years, I think, I bought the house for

2  bank-owned to the three years sold.  If I just live there, the

3  house it can be increased 200,000.  Three years I did a lot of

4  work:  Repair, cleaning, find a tenant, pay the electric bill,

5  gas bill, everything I do.  I didn't ask any payment because

6  it's the family.  I wonder maybe he had -- my daughter can get

7  some help from brother.  I bring her here.  Now I say, I don't

8  agree.  I want to know business can be making money.  Can be

9  losing money.  That's called investor.  He have to understand.

10 You want to make money, you are working hard.

11 Q.   What did you do with the profit from that first house --

12 A.   Uh-huh.

13 Q.   -- that you purchased in 2013?

14 A.   Yeah, the house purchase.  I clean it, I would say, out of

15 everything, lease the house for three years; collect the rent,

16 everything issues or not issues, brand new house, and then I put

17 the house on the market.  I finished over 20 pages

18 questionnaire.  He didn't agree.  She don't know how to do it.

19 I do the whole thing.  House successful sold, and money directed

20 go to his account.

21      THE COURT:  Okay.  Okay.  That's fine.  That's the

22 answer to the question.  Just off the record for a second.

23      (Discussion off the record)

24      THE COURT:  Mr. Stone, next question.

25      MR. STONE:  Can I ask the same question of you, Judge?

```
 1            THE COURT:  I am fine.
 2  Q.   All right.  So moving on, were there other properties in
 3  Seattle that you owned and purchased?
 4  A.   Yes.  That's back to yesterday's testimony.  He say I used
 5  the plaintiffs' $600,000 to buy my own house.
 6            THE COURT:  Mr. Wang, let's just focus on one question
 7  at a time.  I know there is a lot that you heard yesterday, and
 8  there is a lot that you want to try to say in response; but
 9  Mr. Stone's job is to ask you a series of questions to elicit
10  the information that is important for your case.
11            THE WITNESS:  Okay.
12            THE COURT:  I am quite sure that Mr. Stone will get to
13  all of the points.
14            THE WITNESS:  Okay.
15            THE COURT:  But to make it go a little bit more
16  smoothly, it will help if you just listen to his question,
17  answer his question, and then he will get to all of these things
18  in the order that he is planning to get to them.
19            THE WITNESS:  Okay.
20            THE COURT:  Also, at some point later, as you have
21  seen, we will take a break.  You will have a chance to talk to
22  Mr. Stone a little bit more.  If there are some things that you
23  feel like you haven't been able to say that you want to make
24  sure he asks you about, you can talk to him about it then; but
25  for now, just try to focus on his question and answer.
```

1           So his question was, I believe:  You owned other

2  properties in Washington.

3           THE WITNESS:  Yes.

4           THE COURT:  Let's just focus on that, and we will talk

5  about the $600,000 and how it was -- we will talk about that

6  when we get to it.  All right?

7           Go ahead, Mr. Stone.  Let's ask that question again.

8           MR. STONE:  You understand that instruction?

9           THE WITNESS:  Yes.

10 Q.  Okay.  So were there other properties that you purchased in

11 Seattle?

12 A.  Yes.

13 Q.  And did those properties have anything to do with your

14 earlier relationship with Mr. Bao?

15 A.  No.

16 Q.  And what were the -- what was the purpose of purchasing

17 those properties?  Were they also investment properties?

18 A.  Some is permanent house.  Some is vacation house.  Some is

19 investment house.

20 Q.  Okay.  Now, did there come a time when you sold that house?

21 A.  Uh-huh.

22 Q.  And can you give us an approximate date as to when those

23 properties were sold?

24 A.  I moved here 2016.  I sold the two house in Washington

25 state is under 2000 -- I believe around like either '16 or early

1   '17.  Two house sold it.

2   Q.   Had you yet purchased any property in New Jersey?

3   A.   Yes.

4   Q.   So can you explain to the judge what you purchased and when

5   the purchase took place?

6   A.   Yes.  That's the house I was just earlier on the record.  I

7   live there, Iron Latch Court on Upper Saddle River, Jersey, zip

8   code 07458.

9   Q.   Do you have an accountant?

10  A.   I do.

11  Q.   Did you have a lawyer that discussed with you any method of

12  deferring any tax liability on the profits?

13  A.   Yes.

14  Q.   And when they did that, did they discuss with you what is

15  called a 1031 exchange?

16  A.   Yeah.  Actually, 1031 -- I do 1031, but the 1031 is for the

17  owner provider.  I wanted this house for tenants continue with

18  the lease.  I want to sold this house, purchase another house.

19  I was provided a realtor.  The realtor sent it to the -- only

20  the couple -- couple lawyer office can do 1031 exchange.

21  Q.   Okay.

22  A.   Yeah.

23  Q.   And can you just share with the record so the judge

24  understands, but what is the purpose of a 1031?

25  A.   1031 is just like, you know, I bought a house.  He had a

1 money, certain amount of money I make.  I want to waive the tax.

2 Because I am a tenant, I cannot buy the house.  I live on it.  I

3 make about -- I wanted a half million dollars.

4          THE COURT:  You made a half million dollars when you

5 sold the Washington house?

6          THE WITNESS:  Yes, the Washington house.  I bought it

7 for 480-some thousand.  Then I purchased the Upper Saddle River

8 house from the bank-owned.  I used that money, paid a part of

9 it, and I have -- I have the mortgage on it.

10          THE COURT:  Okay.

11 Q.   Okay.  Now, you did hear Mr. Bao suggest to the Court that

12 you used his money to purchase your present house; is that

13 correct?

14 A.   He will say that, but that's not true.

15 Q.   Okay.  So I want you to clearly explain to the judge what

16 proceeds you used to purchase the New Jersey home.

17 A.   I used the 400-some -- 480 -- let's say half million

18 dollars.  I paid maybe 300-some thousand for the mortgage loan.

19 Mortgage bank name called Emerald Bank.  That's all the county

20 records, on the Union County records.  I can't make it up.  So

21 that's -- I tell plaintiff, he say I made a document in Seattle

22 is fake.  How I going to say?

23          THE COURT:  Just so I understand, to purchase your

24 house in New Jersey, you used approximately $480,000 in profits

25 from the sale of the house or houses in Washington, correct?

X. Wang - Direct - By Mr. Stone

```
 1              THE WITNESS:  Correct.

 2              THE COURT:  And then you took a mortgage for the rest?

 3              THE WITNESS:  Correct.

 4              THE COURT:  Okay.  And just so I understand, were

 5  there other houses in Washington that you sold later like in

 6  2018 or '19?

 7              THE WITNESS:  Yes.

 8              THE COURT:  Okay.  All right.  So maybe we will get to

 9  that later.

10              THE WITNESS:  Okay.

11  Q.  Let's do it now.  Were there other homes that you had

12  invested in in Seattle that you later sold?

13  A.  Yeah.  The two houses I was sold the 1031, that's my

14  investment house.  That's, I sold it.  I have the profit.  I use

15  1031 exchange to buy the New Jersey house.

16      Then another two house, a pretty big house, actually, that

17  house, one is my permanent resident house.  One is my second

18  house was called vacation house.  I sold it around like 2000 --

19  I think '19, '19.  Another one was sold about 2020.  Yeah.

20  Q.  And the proceeds from those houses had nothing to do with

21  your financial arrangement with Mr. Bao?

22  A.  No.  No.

23  Q.  Okay.  Now, let's talk about what led up to the investment

24  in Piermont.

25  A.  Uh-huh.
```

1  Q.   So prior to 2016, did there come a time when there were

2  communications between you and Mr. Bao in regard to his desire

3  to move to the United States?

4  A.   Yes.

5  Q.   And could you explain to the judge the essence of those

6  communications before there was even a Piermont project?

7  A.   Okay.  Yeah.  This be maybe a little bit long if the judge

8  say it's --

9            THE COURT:  That's okay.  Go ahead.

10           THE WITNESS:  Like around 2000 -- 2000 -- I can't

11  exactly, maybe '12, 2013, my wife get her citizenship the week

12  before.  Invite sister and brother to come to U.S.

13           In 2012, maybe '10, I went through all the job.  I

14  apply my brother-in-law's family and my sister-in-law's family

15  come to U.S., the paperwork to process immigration in the United

16  States.  Then on the 2015, in China -- I think a lot of people

17  know -- at that time, they send a lot of smart students to come

18  to the U.S. to study from high school, middle school, elementary

19  school.  At that time they wanted -- they followed just like a

20  popular -- you know, they wanted to do that.  They send father-

21  in-law, mother-in-law.  Just my -- my brother's father-in-law

22  and mother-in-law coming to Seattle to check my Tuscany

23  restaurant, talk about me, then asking me if they want to

24  coming, how we going to do it.

25           Then I said, let me think about it.  And then we have

1  the Shanghai Speed there.  That's the only way they can apply

2  them to come here with the kids, work in the U.S.

3          THE COURT:  Why don't you stop there for one second,

4  and then let me just ask you:  You said your father-in-law and

5  mother-in-law, that would be Ms. Zeng's parents?

6          THE WITNESS:  Yes.

7          THE COURT:  They came to see you when you were living

8  in Seattle?

9          THE WITNESS:  Yes.  We call that investigation.

10          THE COURT:  Ah.

11          THE WITNESS:  Just look like how was I doing.  They

12  wanted to do how I am doing, they look around.  That's how it

13  just started.  Now I say, that's when the truth started.

14          THE COURT:  Okay.  And that was in approximately 2015?

15          THE WITNESS:  '15.

16          THE COURT:  And prior to that, did you have any

17  relationship with Ms. Zeng's parents?

18          THE WITNESS:  No.

19          THE COURT:  Okay.  Mr. Stone?

20  Q.  All right.  So were there discussions between you and

21  Mr. Bao about somehow participating in some investment?

22  A.  Yes.

23  Q.  Tell the judge about that.

24  A.  Then we have the Piermont -- we have the Piermont project

25  that come out of, let's say, it's because the family restaurant

1  had a nice -- very nice area.  I discuss with him, send all the

2  paperwork.  Very interesting.  Then we started.

3          THE COURT:  Can I ask you actually one second about

4  that?  At the time you had this idea to do the Piermont

5  investment, you were living in Seattle?

6          THE WITNESS:  In Washington -- in New Jersey.

7          THE COURT:  Okay.  So you had already moved to New

8  Jersey?

9          THE WITNESS:  I moved to New Jersey 2015.  I discuss

10 it with -- they come here and visit New Jersey, not Seattle,

11 visit New Jersey, his parents.

12         THE COURT:  Mr. and -- I am sorry -- Ms. Zeng's

13 parents, when they came to do the investigation that you said --

14         THE WITNESS:  Yes.

15         THE COURT:  -- that was the Tuscany restaurant, which

16 was in New Jersey?

17         THE WITNESS:  Yes.

18         THE COURT:  Okay.  So you had already moved to New

19 Jersey, and you had already been operating at least one

20 restaurant in New Jersey?

21         THE WITNESS:  Yes.

22         THE COURT:  Got it.  Okay.  Go ahead.

23         MR. STONE:  Just to clarify a little bit, Judge.

24 There is a town of Washington --

25         THE COURT:  That's okay.  If you need to, you have to

1 bring it in through the witness.  I understand it now, I think.

2 Q.   So when that discussion started, did you obtain the

3 financial records of the businesses that were located in

4 Piermont?

5 A.   Of course.

6 Q.   Right.  Did you review the profit and loss, the receipts,

7 the books and records, was that part of the acquisition?

8 A.   Yes.  That's the two things can support it.  One thing is I

9 had SBA loan; you must be have the paperwork to support this

10 loan.

11 Q.   Okay.  But before you get to that, before you began the

12 financing --

13 A.   Uh-huh.

14 Q.   -- did you study the financial background of the property,

15 the rentals, and the businesses that were operating in Piermont?

16 A.   Yes.  Yes, I did.

17 Q.   Now, did you know Mr. Bao's financial education and

18 background?  Were you aware that he had a background?

19 A.   Oh, yeah.

20 Q.   Did you share with him that financial information?

21 A.   Yes, of course.  Later somebody put their money into, got

22 to bring some -- I am going to say the picture, was nothing

23 there, okay, bring the money.  If knowledge of people will know,

24 I give them all the things, but my email is linked to the maybe

25 six, seven companies.  The time email too much.  Delete, you

1  know, I just can't find the records.

2  Q.   But did you send to him --

3  A.   Yes.

4  Q.   -- for his review the records that you studied?

5  A.   Yeah.  Positive.  Yes.

6  Q.   Did the two of you discuss the purchase of the property and

7  the businesses?

8  A.   Yes.

9  Q.   Okay.  Now, I am going to leave that for a moment.

10 A.   Okay.

11 Q.   I am going to move to a different area.

12 A.   Okay.

13            THE COURT:  Let me just -- I am sorry to interrupt

14 you, Mr. Stone.  Two more things.  Everything is going -- I can

15 understand everything fine so far, but two things:  One, Darby,

16 the court reporter, she is trying to type down everything

17 everyone is saying.  It's very hard for her, as talented as she

18 is --

19            THE WITNESS:  Too fast.

20            THE COURT:  It's very hard for her to type two people

21 talking at the same time.

22            THE WITNESS:  All right.  Got it.

23            THE COURT:  So let Mr. Stone finish, and then you

24 answer, and then Mr. Stone will let you finish before his next

25 question, and then maybe a little bit slower.  That might be for

1  me, not for Darby.  Go ahead.

2          THE WITNESS:  Thank you.  Sorry.

3  Q.  All right.  Let's talk about the corporations that were

4  involved in this big picture.  I want to first talk about

5  Shanghai Speed.

6  A.  Okay.

7  Q.  Are you familiar with that corporation?

8  A.  Oh, yeah.

9  Q.  All right.  And how long have you been familiar with the

10 corporation that we will refer to as "Speed"?

11 A.  A long time.

12 Q.  So you've got to give us a framework.  About how long?

13 A.  That one like maybe ten years.

14 Q.  And in the early years, did you know who owned or were the

15 principals of Shanghai Speed?

16 A.  Yes.  Is my mother-in-law, the mother-in-law's my wife's

17 mom.

18 Q.  Okay.  And just share with Judge Krause, what does Shanghai

19 Speed do?

20 A.  Shanghai Speed is a management company.  Management just a

21 consulting -- a consulting here even better.  Consulting in the

22 restaurant, hospitality, and that connect -- just like the

23 connect was called -- we called it third service of the company

24 with hotel, restaurants, consulting, sale out, managing.  They

25 can make a management fee on it.

```
 1              THE COURT:  Can we just go back one second?  You said
 2  the owner ten years ago or so, when you first learned about
 3  Shanghai Speed, was your wife's mother?
 4              THE WITNESS:  Yes.
 5              THE COURT:  Was anybody else the owner at that time?
 6              THE WITNESS:  Yeah, another partner -- I don't know --
 7  maybe the plaintiff here father-in-law.
 8              THE COURT:  That's Ms. Zeng's -- Mr. Bao's
 9  father-in-law or Ms. Zeng's father?
10              THE WITNESS:  Correct.
11              THE COURT:  Okay.  So it was Ms. Zeng's father and
12  your wife, Mrs. Bao's, mother?
13              THE WITNESS:  Yes.
14              THE COURT:  They owned this company together?
15              THE WITNESS:  Yes.
16              THE COURT:  Okay.  Mr. Stone.
17  Q.   Okay.  Were you aware that Mr. Bao worked for Shanghai
18  Speed?
19  A.   Yes.
20  Q.   And can you -- do you know in what capacity he worked?
21  A.   He's general manager.
22  Q.   And when you say general manager, did he participate, to
23  your knowledge, in that which you just described to Judge Krause
24  about hospitality, hotel, restaurants?
25  A.   Yes.  Basically, the time he actually maybe -- maybe he got
```

1  two jobs:  One is in the bank, one is inside -- inside own

2  business.

3  Q.   And you also knew that he was a long-term employee of the

4  Bank of Shanghai?

5  A.   Yes.

6  Q.   Okay.  So with that background, from somewhat a decade ago,

7  did there come a time when, to your knowledge, you and Mr. Bao

8  became shareholders in Shanghai Speed?

9  A.   Yes.  Around like 2012, maybe 2012, 2013, I can't remember,

10  2012, that I had 51 percent on the Shanghai Speed, a majority

11  owner.

12  Q.   Okay.  And can you tell us who conveyed that interest to

13  you?

14  A.   Most the share from mother-in-law.  That means my wife's

15  mom.

16  Q.   And I'm looking for it now, but I believe there was a

17  certificate of 510,000 shares; do you remember that?

18  A.   Yes.  That's the -- yes.  That's the certain people's

19  signed it, including the plaintiff was on there, too.

20  Q.   And I asked Mr. Bao yesterday, but I am going to ask you:

21  Were you aware whether or not he was also a shareholder in

22  Shanghai Speed?

23  A.   Yes.

24  Q.   And do you recall what percentage ownership he received?

25  A.   More than a hundred percent.

```
 1   Q.   Okay.  And did that occur at or around the same time that
 2   you received your shares?
 3   A.   I can't remember.  I can't recall.  I knew it, but I don't
 4   know exactly the day.
 5              THE COURT:  Okay.  Hold on one second.  Ms. Han?
 6              What are you doing?  The purpose of having your phone
 7   here -- off the record.
 8              (Discussion off the record)
 9              THE COURT:  We can go back on the record.
10              MR. STONE:  I am going to be referring to Defendant's
11   P2.  Hold on.  I made a mistake.
12              THE COURT:  Now, Mr. Stone, this is not an exhibit
13   that's in evidence.  So --
14              MR. STONE:  I don't believe so, Judge.
15              THE COURT:  All right.
16              MR. STONE:  If I can find the right one -- I don't
17   have it here.  Hold on.  Bear with me one second, Judge.  I'm
18   sorry.  Well, I am going to use -- I am going to use P4, Judge.
19   Q.   Mr. Wang, let me show you what we have marked for
20   identification -- you can sit down -- for identification only.
21   You see that's a letter that's -- does that make reference --
22              THE COURT:  Hold on.  Go back.  This is a document
23   that's not in evidence.  So let's go through the regular
24   process.
25              Mr. Wang, Mr. Stone has handed you a document that's
```

1   been identified, that has been marked for identification as

2   Defendants' Exhibit P4.  Do you recognize that document?

3              THE WITNESS:  Yes.

4              THE COURT:  What is it?

5              THE WITNESS:  This is I am a majority 50 percent

6   shareholder.  General manager Shuzhong Bao, 20 percent.

7              THE COURT:  I am not asking what it says.  I am

8   asking:  What is the document?

9              THE WITNESS:  The document is the transfer that I get

10  the ownership from somebody, from my mother-in-law 51 percent.

11             THE COURT:  Okay.  And have you seen this document

12  before?

13             THE WITNESS:  Yes.

14             THE COURT:  And how did you come to see the document?

15             THE WITNESS:  The document, I can't remember.  I think

16  Shuzhong Bao sent it to me.

17             THE COURT:  You think Mr. Bao sent it to you?

18             THE WITNESS:  Yes.

19             THE COURT:  Okay.  Just for the record, the document

20  at the top of it says it is from Shanghai Donghai Law Firm, and

21  it says -- in the English translation at least -- it says,

22  Letter of Attestation.  I don't know if this document was

23  originally in Chinese, although I suspect it probably was.

24             THE WITNESS:  It was --

25             THE COURT:  Hold on.  Just hold on.

```
1              THE WITNESS:  Okay.

2              THE COURT:  So, Mr. Stone, you are seeking to move

3   this into evidence?

4              MR. STONE:  No.  I just wanted to make sure that -- I

5   am trying to get the date of when the transfer took place, and I

6   think that makes reference to a date to refresh his

7   recollection.

8              THE COURT:  But then if we are using it to -- that's

9   not how we do that.

10             MR. STONE:  Pardon me?

11             THE COURT:  That's not how we do that.  I mean, if you

12  want to refresh his recollection, you have to ask him the date,

13  when it happened, and then if the document refreshes his

14  recollection, and not have him read from the document.  This

15  document is not in evidence.

16             MR. STONE:  That's what I was -- I was about to do

17  that.

18             THE COURT:  Okay.  All right.  Next time, though, ask

19  him the question that you are trying to refresh him on before

20  you show him the document.

21             MR. STONE:  Okay.  All right.

22             THE COURT:  Okay.  So turn that document over, please.

23             Ask the questions that you think he is not going to

24  know the answer to, or maybe you have already asked that, and I

25  forgot now.  But just ask him again.  We will try to do it that
```

1  way.

2  Q.   Do you remember the approximate date when you and Mr. Bao

3  received a conveyance of the respective shares in Shanghai

4  Speed?

5  A.   2012, I can't -- early, maybe early that year.  I can look

6  the day.  I estimate about early -- 2012 for sure, but -- I

7  can't remember exactly the date.

8  Q.   Would it be helpful --

9           THE COURT:  Early 2012 I think makes the point,

10  Mr. Stone.  We don't need to -- I mean, we don't really need to

11  get into the details.

12           MR. STONE:  I don't want to belabor the point.  I

13  mean --

14           THE COURT:  But he says early 2012.

15           MR. STONE:  Okay.  Let's move on.  Let's move on.

16           THE COURT:  Okay.

17           MR. STONE:  Bear with me a second.  All right.

18  Q.   So after 2012, did -- to your knowledge, did Mr. Bao

19  continue to be employed by both the bank and Shanghai Speed?

20  A.   Yes.

21  Q.   Okay.  Now, as 2015 approached, were there more serious

22  discussions between you and the plaintiff about the property and

23  businesses located in Piermont?

24  A.   Yes.

25  Q.   And did those conversations take place by phone, email,

X. Wang - Direct - By Mr. Stone

1  some other method of transmitting information to one another?

2  A.   If the conversation was the deal, yes.  Mostly on the

3  phone.

4  Q.   Okay.

5  A.   WeChat we call.

6  Q.   WeChat?

7  A.   Yes.

8  Q.   Okay.  And during those conversations, in the early

9  conversations, did -- had you already provided the financials of

10 the investment to Mr. Bao?

11 A.   Yes, I did early.  Yes.

12 Q.   Did the two of you have any discussions about the substance

13 of the economics of the deal?

14 A.   Yes.  Because all the paperwork's English, I was one by one

15 explained to what was there, and also he was maybe find some

16 translation.  He know exactly the deal.

17        THE COURT:  Okay.  Can I just -- can we clarify?  I

18 just want to make sure I understand when this is happening.  Do

19 you want to ask that?

20        MR. STONE:  All right.

21 Q.   Can you -- strike that.

22    Can you tell us about when this process took place?  Was it

23 in '16, '15, '14?

24 A.   '16.  '16, maybe early '16 or I think it's early '16.

25 Q.   Okay.  Now, at some point the two of you decided to make an

1  offer for the property and the businesses; is that correct?

2  A.   Yes.

3  Q.   Can you tell us a little bit about it?  Was there a realtor

4  involved?

5  A.   Yes.

6  Q.   And anything that you did -- oh, strike that.

7       Was Mr. Bao and his wife in the States in early '16?

8  A.   No.

9  Q.   So whatever you were doing here in regard to this

10 investment, did you have the authority to do that with Mr. Bao?

11 A.   Yes.

12 Q.   Did he ever object to anything?

13 A.   No.

14 Q.   Did he ever -- was he ever critical of any of the

15 financials?

16 A.   No.

17 Q.   Did he ever comment to you about, well, the deal looks

18 good; it looks like it could be profitable, the property is

19 located in a good spot?  Did he have those discussions with you?

20 A.   Oh, yeah, of course.  If not, he not going to do it.

21 Q.   Now, at some point you must have started to speak about

22 money?

23 A.   Yes.

24 Q.   So before you spoke about the deal between the two of

25 you --

1  A.    Uh-huh.

2  Q.    -- you had to talk about the deal of the acquisition of the

3  Piermont project?

4  A.    Yes.

5  Q.    Okay.  So --

6          THE COURT:  Hold on.  You are saying you -- when you

7  -- well, let me -- can you clarify, Mr. Stone -- what I don't

8  understand from that question is when the terms of the deal

9  between Mr. Wang and Mr. Bao were put in place relative to when

10 the realtor got involved in terms of the actual purchase because

11 we've sort of blurred all of that together now, so I would like

12 to be a little bit more precise about the sequence.

13         MR. STONE:  I'm going to ask those questions.

14         THE COURT:  Okay.

15         MR. STONE:  But may I share something with you?

16         THE COURT:  Okay.

17         MR. STONE:  All right.  When you do a deal, first you

18 look at the deal --

19         THE COURT:  I don't care about generally.  I really

20 just want to know how it all worked here.

21         MR. STONE:  So I am going -- let's go over it again.

22 Q.    Before you talked -- you spoke to Mr. Bao about the details

23 of your relationship, you had to take a look at the project

24 itself to see if it was viable?

25 A.    Yes.

1  Q.   And did the two of you do that with each other?

2  A.   Yes.  Also I would tell him the status of the deal.

3  Q.   You would report to him?

4  A.   Yes.  Let's say with the freezer check, where the hazards

5  in the ground, oil tank, everything.  I was reported one step by

6  one step by one step.

7  Q.   So let's share that with the judge because I don't know if

8  Judge Krause has a background in these types of projects.  We

9  have to be a little bit more detailed.

10         THE COURT:  No, that's fine.  This is all taking

11  place, all of the investigative steps and the site visits and

12  the environmental evaluation, all of that is taking place before

13  you came to an agreement with Mr. Bao on the exact terms of the

14  investment; is that right?

15         THE WITNESS:  No.  Because the deal, we set out the

16  deal how we going to do the -- for this project, right, how much

17  money we needed, how we are going to do it.  That's early,

18  early, earlier than the deal was being closed.

19         THE COURT:  Okay.

20  Q.   Okay.  So let's get into -- let's go back first to Shanghai

21  Speed.

22  A.   Uh-huh.

23  Q.   Did Shanghai Speed have any relationship to the Piermont

24  project?

25  A.   Before the project, no.  I only just the shareholder.  I am

1  not going to -- yeah, let's say no.  Yes.

2  Q.   But at some point there was a formation of several

3  corporations, correct?

4  A.   That time actually no corporation.

5  Q.   Right.

6  A.   Yeah, I only had one Sunwoo Management, not more

7  corporation yet.

8  Q.   So when the offer was made to purchase Piermont, was it

9  made in the name of a corporation or was it made in the name of

10  an individual with a corporation yet to be formed?

11  A.   I don't know exactly the day.  First start with the Sunwoo

12  Management.  We call Management.

13  Q.   Right.

14  A.   After that, we file they called "Inc.," which is Sunwoo

15  Trade, Inc. another company called 506 Holding.  Then we easy

16  we call "Holding."  We started Management, Inc. first.  Set out

17  percentages of this deal that advises of percentage for each

18  party.  That time we set out Shanghai Speed, just like a use

19  this corporation for the foundation.  Then we have the deal with

20  the -- is the Inc.  The Inc., because we have to purchase the

21  Inc. for the two companies.  One company is the Sunwoo, Inc.

22  Another company is called -- was called Shanghai Company,

23  Shanghai Company.  We both invests this property, but actually

24  they -- later on they split the real estate how much with the

25  holding company, how much for the business.  That's for the

1  liquor license and liability issues.  So basically, we have

2  the -- we have the deal, not -- but we have started talking that

3  one.  We have the Sunwoo Management Company, and later on we

4  applied because the only that year close Sunwoo Trade, Inc.

5           THE COURT:  Okay.  This is not a language barrier

6  issue.  This is a corporate language issue.  I did not

7  understand that at all.  That's not because of an English versus

8  Mandarin issue.  I just didn't follow that at all.

9           THE WITNESS:  Okay.

10           THE COURT:  And so we are going to have to try to do

11  that again.

12           THE WITNESS:  Okay.

13           THE COURT:  Can I ask this question?  Before you made

14  any offer, you or any corporate entity or whoever made the offer

15  to purchase the 506 Piermont real estate or the restaurants, had

16  you and Mr. Bao agreed on the terms of the investment that he

17  would make in this entire project?

18           THE WITNESS:  Actually, the deal -- I direct talked to

19  Shuzhong Bao was not really involved.  We have Speed, and we

20  have -- we called his father-in-law.

21           THE COURT:  So you are saying --

22           THE WITNESS:  Everybody know it.

23           THE COURT:  So your testimony is that it was not just

24  a deal between you and Mr. Bao; that it also involved Shanghai

25  Speed and Mr. Bao's father-in-law?

1            THE WITNESS:  Yes.

2            THE COURT:  Hold on one second.

3            THE WITNESS:  Okay.

4            THE COURT:  And so were the terms -- from your

5    perspective, were the terms of that arrangement, the terms of

6    the deal between you and whoever else was involved, were those

7    agreed upon before you made any offer to purchase the property

8    and the restaurants?

9            THE WITNESS:  Actually, yes.

10            THE COURT:  Okay.  Can you tell me what the terms of

11    that deal were in terms of how the money would be invested from

12    Mr. Bao and anybody else in China; how that would flow into this

13    506 Piermont project?  From your perspective, what were the

14    terms of that arrangement?

15            THE WITNESS:  Basically, we counted the money is about

16    like a $600,000 in Shanghai company into the deal.

17            THE COURT:  Okay.  So $600,000 would be coming from

18    China --

19            THE WITNESS:  Yes.

20            THE COURT:  -- into the deal?

21            THE WITNESS:  Yes.

22            THE COURT:  Okay.  And from your perspective, how was

23    that $600,000 allocated?

24            THE WITNESS:  $600,000 was, just as I said, we have

25    put the -- what's called an earnest money down payment, tax,

1    closing, all the costs.

2            THE COURT:  Okay.

3            THE WITNESS:  Yes.  That's the parcel money after deal

4    closed about like a 320,000, 330,000, the cash to close the

5    deal.

6            THE COURT:  You needed to have 320 or $330,000 in cash

7    to close the deal?

8            THE WITNESS:  Yes.

9            THE COURT:  Okay.

10           THE WITNESS:  Then the rest was a loan.

11           THE COURT:  Okay.

12           THE WITNESS:  The commercial loan, yeah.

13           THE COURT:  And then the rest would be financed by a

14   commercial loan?

15           THE WITNESS:  Yes.

16           THE COURT:  Okay.  And the $600,000 that was coming

17   from China --

18           THE WITNESS:  Yeah.

19           THE COURT:  -- first of all, how was that -- where was

20   that money coming from?

21           THE WITNESS:  The money come from Shanghai Speed.

22           THE COURT:  All of it?

23           THE WITNESS:  Yes.

24           THE COURT:  So -- okay.

25           THE WITNESS:  In my knowledge, it come from Shanghai

 1  Speed.  I never get any shareholder, any another people saying

 2  that money come from certain people, and I never got any notice.

 3  I never know until they come and said, oh, that's my money.

 4        THE COURT:  Okay.  So your understanding at the time

 5  of the transaction was that the $600,000 that was coming from

 6  China as part of the investment in this project, it was all

 7  coming from Shanghai Speed?

 8        THE WITNESS:  Yes.  We have the documentation to

 9  support that.

10        THE COURT:  Okay.  And with all of that money coming

11  from Shanghai Speed, in your telling, how was that money

12  supposed to be used for the project?

13        THE WITNESS:  The money should be used all of it to

14  the business.

15        THE COURT:  Okay.

16        THE WITNESS:  Even I owned 51 percent, I still have

17  put it in the business.

18        THE COURT:  Okay.  And in your understanding, how was

19  that money transferred from China to the United States?

20        THE WITNESS:  That's I only hear from the plaintiff.

21  I don't know exactly.  Maybe I knew it because the -- they can't

22  send money to the company.  That's the one thing for the -- over

23  there, just regulation.

24        Another thing is we don't have the company yet.

25        THE COURT:  Okay.

1          THE WITNESS:  Yeah.  That's the only thing they can

2  send is to me because we need the money to purchase, and I am

3  not going to find a company waiting for the money -- even I have

4  the company, they still can't send the money to the firm, the

5  oversea the people.  They -- the money, only what it used for,

6  only for, okay, tours -- you want the tour, just like come here,

7  tours, and some kids study U.S., and that's like a --

8          THE COURT:  Okay.

9          THE WITNESS:  -- life expenses.  Not going to say I

10  just got investment.

11          THE COURT:  Okay.  So your testimony is that there are

12  restrictions on how individuals in China, what they can transfer

13  money to the United States for?

14          THE WITNESS:  Limited, yes.  That's why limited to

15  50,000.

16          THE COURT:  Limited to 50,000 for individuals?

17          THE WITNESS:  Yes.

18          THE COURT:  But you said the money all -- from your

19  understanding, it all came from Shanghai Speed?

20          THE WITNESS:  Correct.

21          THE COURT:  And does a corporation like Shanghai Speed

22  have those same restrictions?

23          THE WITNESS:  Shanghai Speed, if the corporation here

24  wire the money to the individual in the same country, doesn't

25  have anything.

1              THE COURT:  But what about if Shanghai Speed was going
2  to wire the money to the United States?
3              THE WITNESS:  That's the -- that's the set -- how the
4  plan was set out.  If the Shanghai Speed want an investment
5  oversea, you have to go to Shanghai oversea, just like an
6  oversea money, you have the proof by the government.
7              THE COURT:  Okay.
8              THE WITNESS:  They want to cross this one, they just
9  send, give the money to the other individual.  The individual or
10 other individuals say this money is sent over.
11             THE COURT:  Okay.
12             THE WITNESS:  That's -- I was -- if I can say that,
13 it's just a back to the before.  I would send the regulation to
14 the plaintiff.  They said, I threaten them.  I was looking at
15 how -- just like what?  And I looking at all, all the regulation
16 really, really clear.  I have the paperwork there.  They said I
17 am threatening.  I don't know.
18             THE COURT:  All right.  Go ahead, Mr. Stone.
19 Q.   What happens to the money if it goes from Shanghai Speed
20 improperly to a corporation in the states?  What happens to the
21 money?  Is it exposed?
22 A.   Say that again?
23 Q.   What happens -- if Shanghai Speed sends the money directly
24 to an investment corporation in the states, is that money
25 exposed to some regulation in China?

X. Wang - Direct - By Mr. Stone

```
 1  A.    No.  It's blocked.  They can't do it.

 2  Q.    They can't do?

 3  A.    There is a host -- the reserve, they say the corporation.

 4  It's gone.  Yes.

 5  Q.    Is that -- can they confiscate that money?

 6  A.    Yes.  That's the big corporations, the Chinese they have

 7  some -- they have the proof by the Chinese government big chunk

 8  of the money comes to the U.S.  If not an individual, you have

 9  to go through that process.

10  Q.    Do you remember the taped conversation from yesterday?  Do

11  you remember that?

12  A.    The tape conversation, I say -- you got a lot of work if

13  it's legal, illegal.  As for me, it's -- I am totally is -- it

14  doesn't matter.  They are legal.  He pick up the things good for

15  him.  He didn't say, oh, I talked.  The tape the things.  He

16  like it.  He sent it to the Court.  And the WeChat conversation,

17  you know, the WhatsApp, the WeChat, that was -- I say I don't

18  like, I can delete it.  After I delete it, sent it to the Court.

19            THE COURT:  Okay.  Stop.  Okay?  If there is other

20  evidence that could have been submitted, this is not the time to

21  start objecting to the contents --

22            THE WITNESS:  Sorry.

23            THE COURT:  That's okay.  It's not the time to start

24  objecting to the contents of the documents or suggesting that

25  they are incomplete.
```

```
 1              THE WITNESS:  I'm sorry.

 2              THE COURT:  Just wait.

 3              THE WITNESS:  Okay.

 4              THE COURT:  If there was a time to do that, that time

 5  was long ago.  If there was an objection to be made that the

 6  documents were incomplete or that they didn't tell the complete

 7  story, that objection should have been made long before the

 8  trial.  So any objection to that effect has been waived unless

 9  there is some compelling evidence to the contrary that these

10  documents are incomplete, which it can't just be your testimony,

11  especially not at this point in the case.

12              THE WITNESS:  Okay.

13              THE COURT:  So let's not -- the question was:  Do you

14  remember the recording from yesterday?  Clearly, the answer is

15  yes.

16              If you have a specific question about that, Mr. Stone,

17  you can ask the specific question.

18  Q.   Did you ever intend to threaten Mr. Bao?

19  A.   Okay.  Let's say --

20              THE COURT:  Hold on.  Listen to the question.  Hold

21  on.  Listen to the question, and then just answer the question.

22  One person at a time.  Go ahead.

23  Q.   Did you ever intend to threaten Mr. Bao in that phone

24  conversation?

25  A.   No.
```

1  Q.   So let's go back to the question the judge asked, then I

2  will follow up.  At some point, did you and Mr. Bao outline the

3  terms of what your business relationship was going to be in

4  regard to Piermont?

5  A.   So please ask your question again.

6  Q.   Okay.  Did you two come to an agreement as to what were the

7  terms of the agreement between you and Mr. Bao as it relates to

8  the Piermont property, businesses, apartments, operation, did

9  you make a deal?

10 A.   There is actually, again, that's should be -- maybe

11 Shuzhong Bao representative Shanghai Speed, but basically, I

12 talked him -- I just feel talk to Shanghai Speed.  We have

13 the -- we have the agreement, majority agreement, just like a

14 percentage of this deal.

15 Q.   Okay.  So let's talk about that.  What was the percentage?

16 A.   I got a total $600,000 in the project.

17             THE COURT:  Meaning you received $600,000?

18             THE WITNESS:  Yes.  It's basic 600, but take some

19 banker fees and whatever.  Just call it 600.

20             THE COURT:  Call it $600,000.  You received that in

21 from China?

22             THE WITNESS:  Yeah.

23             THE COURT:  Okay.  And then how much were you going to

24 put up for the deal yourself?

25             THE WITNESS:  Okay.  That is what I already said.  I

1  was told put on deal is about like on the closing statement

2  200 -- 214,000 on the closing statement I have here, and plus

3  the inventory because one is the wine bar, high-end restaurant,

4  high inventory.  The inventory costs about 100 -- I can't

5  remember exactly -- more than a hundred thousand.  Maybe cost

6  150, between 120 to 150.  Other things, they are going to be

7  300, 370 or 350 or 370.

8          THE COURT:  Okay.  Mr. Stone, is there an exhibit that

9  lays this out at all or no?

10         MR. STONE:  I am sorry, Judge?

11         THE COURT:  I am sorry.  Is there an exhibit that lays

12 out --

13         MR. STONE:  It does.

14         THE COURT:  Good.  Let's see it.

15         MR. STONE:  May I approach?

16         THE COURT:  Is this an exhibit that's in dispute, Ms.

17 Han?

18         MR. STONE:  This is N2.  I think it's also plaintiff's

19 exhibit.  The closing statement, but I don't have the

20 correspondence.

21         THE COURT:  N2.  The corresponding exhibit is

22 Plaintiff's Exhibit P, as in Peter.  Is that one in evidence,

23 Salihah?

24         MR. STONE:  It's N2.

25         THE COURT:  Yes, that's the loan documentation, right?

 1  Or at least the first page of it is the loan documentation.

 2           MR. STONE:  The investment statement in there.

 3           THE COURT:  But that's already in evidence,

 4  Plaintiff's Exhibit P, also known as Defendant's Exhibit N, as

 5  in Nancy, 2.

 6           MR. STONE:  May I approach, Your Honor?

 7           THE COURT:  Hold on.  Let me just make sure.  Do we

 8  have that in evidence, P?  Plaintiff's P?

 9           THE DEPUTY CLERK:  Yes.

10           THE COURT:  All right.  Go ahead, Mr. Stone.

11  Q.  I want to show you what's been marked for identification as

12  N2.  Have you seen that?  Take a look through those documents.

13           THE COURT:  I just want to -- off the record for a

14  second.

15           (Discussion off the record)

16           THE COURT:  All right.  Go ahead.

17  Q.  Okay.  Mr. Wang, will you take a look through -- have you

18  looked through that document?

19  A.  Yes.

20  Q.  Can you tell the judge what that is?

21  A.  First the one is the settlement, was all the loan documents

22  on the page -- I don't know what's the page.

23  Q.  Is there a closing statement --

24  A.  Yes.

25  Q.  -- in there?

1  A.   Yeah, closing statement.

2  Q.   So let's go -- let's go to the closing statement.

3  A.   Yes.  Settlement statement, yes.

4  Q.   Can you explain to the -- first of all, how much was

5  borrowed?

6  A.   Let's say, the closing statement two page.  Look the last

7  page.

8           THE COURT:  I am sorry.  Hold on one more second.  I'm

9  just making sure that we are all talking about the same

10 document.  Do you have the document there, Ms. Han?

11          MR. SCHMIDT:  Yes, we do, Your Honor.

12          THE COURT:  And do you agree that N2, Defendants' N2

13 is the same as Plaintiffs' P?

14          MR. SCHMIDT:  Yes, Your Honor, we do.

15          THE COURT:  Okay.  Then I will stop doing this.  Let's

16 talk about specific pages that we are referencing so the record

17 can be clear.

18          MR. STONE:  Okay.

19          THE COURT:  We have Plaintiffs' Exhibit P, also known

20 as Defendants' Exhibit N2.  That's already in evidence.  So

21 which page are you referring to?

22          MR. STONE:  Okay.  So let's start -- let's work our

23 way through it.

24          THE COURT:  Okay.

25 Q.   The first question:  You are familiar with these documents,

1  Mr. Wang?

2  A.  Yes.

3  Q.  And you have seen them before?

4  A.  Oh, yes.  I signed it.

5  Q.  All right.  And before the closing of this loan, did you

6  share the information with Mr. Bao as to how much money you were

7  borrowing?

8  A.  You see, before the closing, I don't have the papers.

9  After closing, I show him.

10  Q.  Okay.

11  A.  Yes.

12  Q.  And did he object to the fact that the loan was for a

13  million $360,000?

14  A.  Yes.  I saw he don't trust it as true.

15  Q.  What?

16  A.  He don't trust it as trust.

17          THE COURT:  He didn't trust that it was true?

18          THE WITNESS:  Yes.  Because it say on the contract

19  1.2.

20          THE COURT:  Okay.  But I think the question I think

21  that Mr. Stone was asking before was:  Before you -- I

22  understand you didn't have the final signed documents until you

23  signed them.

24          THE WITNESS:  Uh-huh.

25          THE COURT:  But before that time, did you ever tell

1  Mr. Bao that you were going to be taking out a loan in the

2  amount of $1,360,000 to purchase this property?

3          THE WITNESS:  Yeah, of course.

4          THE COURT:  Okay.  And you told him the actual amount

5  of the $1,360,000?

6          THE WITNESS:  Yes.  Exactly.  I don't know he

7  understand that, but I explain to them it were 145,000 just for

8  be the renovation because the building old.  Renovation 100,000

9  working capital added together.

10 Q.  Tell the judge a little bit about the renovations.  Did you

11 receive the whole 1,360,000?

12 A.  No.  No.

13 Q.  Explain to the judge why you didn't receive that money?

14 A.  Actually is, I didn't receive anything.  Only I received

15 the $100,000 for working capital.  Because the money go to the

16 seller, whatever.  I was -- the renovation money, bank don't

17 give it to me.  I send a contract.  Just like, okay, today you

18 change the window.  How much cost?  Bank send the money direct

19 to the contractor.  I'm not involved.  I only need to say is the

20 windows finish, floors finish, outdoor is finished, road is

21 finish; the banker send the money direct to the contractor.

22 Didn't come into my hand.

23 Q.  Now, during that process, after the closing, both the

24 acquisition of the property and the renovations, did you have

25 communications with Mr. Bao?

1    A.    Yes.

2    Q.    Was he in the States?

3    A.    He part of it in the States, part of it not in yet.

4    Q.    Was he participating in any of the supervision of the

5    renovations?

6    A.    I can't remember, but he exactly know what I am doing, what

7    are we doing right now.   Yeah.

8    Q.    Okay.   So let's go back to the closing statement.

9    A.    Okay.

10   Q.    Somewhere deep in the closing statement can you find the

11   closing statement?

12        And, Judge, all of the pages are not numbered.

13             THE COURT:   That's okay.   You can just describe it,

14   and I will find it.

15             MR. STONE:   Okay.   So it says Settlement Statement

16   HUD-1.

17             THE COURT:   The HUD-1 form?   Yes, I am familiar with

18   that form generally.   So the HUD-1 form is in the middle of this

19   package of materials that is at Plaintiffs' Exhibit P, also

20   known as Defendants' Exhibit N2.   It says Settlement Statement

21   (HUD-1) at the top the form.   It's a three-page -- well, it

22   says it's a three-page form.   It says page 1 of 3 on the bottom,

23   but there are only two pages here.   The second page is the

24   signature page.   The second page in the exhibit is the signature

25   page.   There's -- there may be a page missing in this HUD-1

1  form.  I am not sure if that's relevant or not, but we have

2  page 1 of 3, and then we have the signature page.  So that's

3  what we have.

4        MR. STONE:  Okay.

5        MR. SCHMIDT:  Thank you, Your Honor.  That conforms

6  with what I have as well from defense.

7        MR. STONE:  Mine, too.

8        THE COURT:  Go ahead.

9  Q.  Mr. Wang, do you have the investment statement in front of

10  you?

11  A.  Yes.

12  Q.  So let's explain how there was a disposition --

13  disbursement of the $1,360,000.

14  A.  Yes.  The detail -- I don't know.  It's so some pretty

15  small.  Yes, just let's say property 960, and the 400 is just --

16  is the line 103.

17        THE COURT:  Okay.  Let me just make sure I understand.

18  Line 101 says Contract Sales Price.  That's $960,000.  That's

19  the price of the property, correct?

20        THE WITNESS:  Yes.  Yes.

21        THE COURT:  To 506 Piermont?

22        THE WITNESS:  Yes.

23        THE COURT:  All right.  Then we have line 104,

24  purchase of Xaviars and Freelance Cafe business assets,

25  $240,000.

1           THE WITNESS:  Correct.

2           THE COURT:  Okay.  So that's a total of 1.2 million to

3  purchase property and the business assets?

4           THE WITNESS:  Correct.

5           THE COURT:  All right.  And then what else do we have?

6           THE WITNESS:  I see here, the 106, I don't know

7  exactly that.

8           THE COURT:  Those are taxes.  106 and 107, those are

9  taxes, right?

10          THE WITNESS:  Taxes.  Then the rest come to the 1.4.

11          THE COURT:  1.437, which amounts to the price of

12 the -- the sum of the contract sales price for the property,

13 purchase of the restaurant assets, the taxes due for the

14 relevant period, city, county and school taxes.  Then there is

15 something that says, settlement charges to borrower, which is a

16 combination of a number of things.  So that gets to a total

17 gross amount due from the borrower of 1.437 and change; is that

18 right?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.

21 Q.  So in addition to the loan, it was necessary for you to

22 bring cash to the closing?

23 A.  Actually, the cash closing I need to bring because the

24 restaurant was still running, the end of the business night, he

25 give me the inventory.  Then we go to the law office.  He give

1  me the inventory.  I write him a check.  Then the deal was

2  closed.

3      The next day, the next two days, I get a working capital

4  from -- from a borrower that's directly go to the business

5  account.

6  Q.  Okay.

7  A.  Yes.

8  Q.  Now let's go back.  So the project closes.  Is Mr. Bao yet

9  working at any of the restaurants?

10  A.  Not yet.

11  Q.  Okay.  So the closing takes place.  At any time prior to

12  that closing, did you and Mr. Bao come to the terms of your

13  agreement as it relates to this project?

14  A.  When you say the terms -- yes.  We always same terms was

15  just like 50/50, whatever comes out, you know, the real estate,

16  business, everything is 50/50.

17  Q.  Okay.  Okay.

18          THE COURT:  Can I just -- while we're on the HUD-1

19  form just one more minute.  You had $600,000 in cash come in --

20          THE WITNESS:  Yes.

21          THE COURT:  -- from China?

22          THE WITNESS:  Yes.

23          THE COURT:  The total gross amount due from you, the

24  borrower, on this transaction was 1.4 million, a little more

25  than 1.4 million?

```
 1              THE WITNESS:  More.

 2              THE COURT:  I mean -- but I am looking at the

 3  paperwork.  It say the $1,437,500.

 4              THE WITNESS:  Then we look at the bottom.

 5              THE COURT:  Yes.

 6              THE WITNESS:  Yeah, look at the bottom.  After that,

 7  we have the 201 -- I don't know what was there -- on the

 8  line 201.

 9              THE COURT:  Yes.

10              THE WITNESS:  And the 2 -- 202 that come out the total

11  that --

12              THE COURT:  Right.  Okay.  But -- and the 202 is the

13  amount of the loan, $1,360,000?

14              THE WITNESS:  Yes.

15              THE COURT:  And then 201 is the $120,000 deposit or

16  earnest money, which would be cash, right?

17              THE WITNESS:  Yes.

18              THE COURT:  So what I am trying to understand is if

19  the total amount due from the borrower to close this transaction

20  was a little bit more than $1.4 million, and you had $600,000 in

21  cash coming in from China, why did the amount of the loan have

22  to be as high as it was?

23              THE WITNESS:  Because the loan, you know, I can't --

24  for the management issues, that's where all the money go to one

25  deal.  We have just the restaurant -- explain restaurant.  They
```

1  taught us that three years the working capital on hand, and the

2  bank approve me.  Banker the one who put all 600 down out of

3  working capital.  When the business not good, my cash chain is

4  broken.  So I have -- plus the money I have the $270,000 on the

5  hand.  And the bank require me just you pay 200 -- I think

6  216,000.  That's the last second page on the 216,000, for the

7  close the deal.  216,000 plus the loan.  I am good.  And also I

8  have the $100,000 working capital.  That's for -- that's for the

9  future working capital you used to have to pay or whatever.

10 Then I still have about a 250 from the Shanghai money on my

11 hand.  I did have the money on hand, and whatever the renovation

12 money from the bank.

13          THE COURT:  But the renovation money from the bank was

14 part of the loan, right?

15          THE WITNESS:  Yes.  Part of the loan.

16          THE COURT:  And $100,000 in working capital was also

17 part of the loan?

18          THE WITNESS:  Part of the loan.

19          THE COURT:  But you are saying that you had to have --

20 if I understand -- $216,000 at the time of closing, based on the

21 line 14 -- the very last line of this document.

22          THE WITNESS:  Yes.

23          THE COURT:  The HUD-1.  You had to have $216,000 at

24 the time of closing that you had to bring with you, plus

25 $120,000 deposit, so that adds up to approximately 340,000.

1          THE WITNESS:  Yes.  Plus, I writed [sic] a check for

2   the inventory.

3          THE COURT:  Plus the check for the inventory.

4          THE WITNESS:  Yeah, inventory.  Bank not going to say,

5   I give you inventory right away.  If give you inventory right

6   away, not enough for the money.  Deal close, everything signed,

7   banker process.  Give me the money.

8          So I have to pay -- I can't remember, 110 to $150,000

9   because a lot of wine.  We have a whole wine cellar.  I paid

10  that on advance on the closing table.

11         THE COURT:  Okay.  So $215,000 for the settlement

12  charges at the closing; $120,000 for the down payment deposit;

13  plus 100,000 or $120,000 for the inventory.

14         THE WITNESS:  Yeah, yeah.  Between --

15         THE COURT:  So that adds up to approximately $450,000.

16  Plus then, if I understand your testimony, you needed to keep

17  some amount of cash on hand on top of the working capital that

18  was provided by the bank as part of the loan because that's the

19  nature of the restaurant business?

20         THE WITNESS:  Yes.  And also I want to say it is

21  because it's an old building that we started cleaning.  The

22  employee broken in the pipe called asbestos.  I don't know my

23  pronounce right or not.  That's the white like a powder.  If you

24  touch it, people smoke and can be lung cancer.

25         THE COURT:  Oh, asbestos.

1              THE WITNESS:  They broke it out.  County coming, I

2    have to clean the whole place, taking them all out.  Taking

3    thousands of the money, but it's not here.  That's from my --

4    from my side.  He know that.  I was clean the whole thing.

5    That's because -- but I didn't count that, not on the closing

6    deal because I paid for that.

7              THE COURT:  Essentially your testimony is that we have

8    covered the specific amounts that are documented here, but there

9    was also some amount that you needed to keep in reserve for

10   working capital and to get you through the slow periods of the

11   restaurant or renovations that weren't covered by the loans or

12   whatever else; you just needed to have some money on hand in

13   order to continue or to float the operations of the restaurant?

14             THE WITNESS:  Correct.

15             THE COURT:  Okay.  Mr. Stone.

16   Q.   Okay.  Now, but did there come a time after the closing

17   when Mr. Bao appeared and began to work at the restaurant?

18   A.   Yes.  But if you want a specific time, as the deal closed

19   in '16 October, he coming here about like February --

20   February 2017.

21   Q.   Okay.

22   A.   About like maybe 14, 15.

23   Q.   But that was part of the deal; you knew that he would be

24   coming later to manage that property, correct?

25   A.    Yeah.  They should come a little bit early because of

1  Chinese New Year's.  I want him coming right away because it's

2  the Chinese New Year, after new year come, so that's why I

3  remember it was February 2017.

4  Q.   Were you operating both restaurants before he arrived on

5  the scene?

6  A.   Yes.  You know, I sleep upstairs the Piermont.  I was the

7  daytime, I would go over there, and in the night I look around

8  because all the people I am new there.  So my wife did a good

9  job.  He's go to the Tuscany.  I am sleeping on the top -- the

10 top of the unit just to manage the two restaurants and deal.  It

11 was just everything.  Yes.

12 Q.   But when you -- when that business started after the

13 closing -- strike that.

14      Before you closed, can you give us an idea of how much

15 annual receipts there were in the two restaurants?

16 A.   Oh, there was a lot.  I say it was 2 million.

17 Q.   Okay.  Did it stay at that level for any period of time

18 after the closing?

19 A.   Say that again?

20 Q.   Did it continue at that level after the closing?

21 A.   Keep a couple months.  I am not going to say whatever whose

22 fault, but just the case is like that I have the winter two --

23 $2 million; in 2019, I got less than 500,000, two restaurants.

24 Q.   So when did Mr. Bao begin to do -- strike.

25      Did he do the day-to-day operations at the restaurants?

1   A.   When he come in, I was him stay the same room.  Hand by

2   hand, tell him a little at a time.  Took me about -- I don't

3   know -- possibly two weeks, more.  Learned every transaction

4   everywhere, everything I taught him all.  Then as I go back to

5   the -- I look at the whole thing because I had kids, and my wife

6   can't all the time go to the --

7   Q.   Was the checkbook located in Piermont?

8   A.   On the first day he come in, I bring to him to the MT Bank

9   just right across us.  I add his name in the first day come.  I

10  pick him up airport, next day morning I just go over there.  I

11  introduce to all the bankers.  I good with the people.  I was

12  introduce, this is my brother-in-law.  He is going to do the

13  restaurant.  He is the operator.  Both check, all he authorized

14  to sign.

15  Q.   Did he have authority to sign checks without getting your

16  permission first?

17  A.   No.

18  Q.   Did he call you every time he wrote a check?

19  A.   No.  That's so many checks.  I couldn't come in every time.

20           THE COURT:  Hold on.  You asked if he had authority to

21  sign checks without getting Mr. Wang's permission first, and he

22  said no.

23           MR. STONE:  Yes.  He said no, he didn't have -- his

24  answer, no, he didn't have to get his authority.

25           THE COURT:  Could you ask the question again?

1    Q.   Okay.  Did Mr. Bao need your authority to sign all the

2    checks?

3    A.   Yes.

4    Q.   He did need authority for you to sign every check?

5    A.   You ask again.  You know, you don't have to give me the

6    next sentence.  Just tell me he is allowed to sign a check

7    without me.

8    Q.   That's -- okay?

9              THE COURT:  Well, off the record.

10             (Discussion off the record)

11             THE COURT:  Your testimony was that Mr. Bao was

12   allowed to sign the checks without your permission?

13             THE WITNESS:  Yes.

14             THE COURT:  Okay.  Was there any threshold where he

15   had to get your permission, like if the check was for more than

16   a thousand dollars or more than $10,000?

17             THE WITNESS:  No.  Because he is already registered on

18   the bank.

19             THE COURT:  Okay.

20             THE WITNESS:  Yeah.  He come the second day I bring to

21   the bank.

22   Q.   Now, how about employees?  Did he have the authority to

23   manage all of the employees?

24   A.   Yes.

25   Q.   Did he have the authority to hire or terminate employees?

1  A.   Yes.

2  Q.   Did he need your authority to do that?

3  A.   Authority to do that.  Just like, you know, I am more

4  experienced.  You asking me the person no or yes, you know.  If

5  the hiring the people if we need it, he never asking me.  Some

6  people I not even know.  I saw the changes later.

7  Q.   Did he have authority to work with the vendors and buy food

8  and other products for the restaurant?

9  A.   Yes.

10 Q.   Now, tell us a little bit about the liquor license.  And I

11 think in order to do this --

12            THE COURT:  Can I ask one other question on the checks

13 while we are on that?  Were there other people at the restaurant

14 who had the authority to write checks at any point?

15            THE WITNESS:  No.

16            THE COURT:  Never?

17            THE WITNESS:  Never.  I was -- you want to go back to

18 yesterday's testimony?

19            THE COURT:  No.  I just want you to answer the

20 question that I am asking you.

21            THE WITNESS:  One thing is that name called Erica

22 (ph).  Liquor check come -- I don't know exactly amount.  Then I

23 will sign the check.  I estimate as a 500,000 -- 500, with no

24 more than a thousand.  Limited thousand under, I sign it.  Then

25 he can write it amount to hand it to the -- hand it to the

1  driver for the liquor.

2          THE COURT:  So for those you had to sign the checks?

3          THE WITNESS:  I signed the checks.  That's is not he

4  coming; that's my brother-in-law that come here.

5          THE COURT:  Before he came here?

6          THE WITNESS:  Before he came here.  For sometime I was

7  registered the liquor.  He asked how many?  500 under.  I just

8  write a check, and which company name on the title, he just sign

9  it.

10          THE COURT:  Okay.  But your testimony is that once

11 Mr. Bao was added to the bank account when he came to the United

12 States in or around February of 2017, there was nobody else at

13 the restaurant who was authorized to write checks on that

14 account other than him?

15          THE WITNESS:  Yes.  Because only two people registered

16 in the bank.  Two signature bank recognize.

17          THE COURT:  Okay.  And Mr. Bao testified yesterday

18 that there was a period of time in 2017 when he returned to

19 China because his father was sick, and then another period of

20 time when he returned to China when his father passed away.  Do

21 you remember that testimony?

22          THE WITNESS:  That's the testimony --

23          THE COURT:  Do you remember that testimony?

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.  So during that time -- well, do you

1  remember that there was a time that Mr. Bao returned to China in

2  2017 because of his father's illness and ultimately his father's

3  death?

4          THE WITNESS:  Yes.

5          THE COURT:  And during that time, was there somebody

6  else at the restaurant who was authorized to write checks?

7          THE WITNESS:  Just I am going to say again.  If I

8  can't remember if exactly people sign, if the people sign or

9  with my signature was under the amount.

10          THE COURT:  Okay.  And then now -- this was another

11  point that came up yesterday in the testimony -- now, Mr. Bao is

12  not working at the restaurant anymore, correct?

13          THE WITNESS:  Yes.

14          THE COURT:  And so does Mr. Bao still have the

15  authority to sign checks?

16          THE WITNESS:  I took it off.

17          THE COURT:  Okay.  And so somebody else signs the

18  checks now?

19          THE WITNESS:  My wife.

20          THE COURT:  Okay.

21          THE WITNESS:  Yes.

22          THE COURT:  Okay.  But not Mr. Bao?

23          THE WITNESS:  No, no.  My wife.

24          THE COURT:  Okay.  Please proceed.

25  Q.  Two things:  Does your wife work at the restaurant every

X. Wang - Direct - By Mr. Stone

1  day?

2  A.   Yes.  Right now.

3  Q.   And why and how did you remove Mr. Bao from operating at

4  the restaurant?

5  A.   So you want me to explain the whole thing?

6       MR. STONE:  Yes.  Judge?

7       THE COURT:  Well, maybe we need to do it in more

8  digestible pieces than that, Mr. Stone, because I feel like it's

9  going to call for a narrative answer.

10      MR. STONE:  Okay.  Listen carefully to me.

11 Q.   Did there come a time when the receipts of the restaurant

12 began to go down?

13 A.   Yes.

14 Q.   And was that during the time that Mr. Bao was managing the

15 restaurant?

16 A.   Yes.

17      MR. SCHMIDT:  Your Honor, if I may, that's --

18      THE COURT:  Sustained.  Sort of leading.  You can ask

19 digestible questions that are still not leading.

20      MR. STONE:  Okay.  And -- well, that's what I asked

21 him before, but --

22      THE COURT:  No, no.  You asked -- you asked why did he

23 remove him from the --

24      MR. STONE:  I think that --

25      THE COURT:  Hold on.  And the question was:  Why did

1   he remove him from the bank to be able to sign it, and I think

2   that there is probably a 12- to 18-month course of dealing that

3   led up to that event.  And so I think we are -- where we are in

4   the story so far, so far from this witness, is that by 2019, the

5   receipts of the restaurant had gone from approximately

6   $2 million to less than $500,000.

7           MR. STONE:  That's correct.

8           THE COURT:  So it's already been established, at least

9   this witness has testified that there's been a substantial

10  decline in the annual receipts of the restaurant; and I think

11  it's been established, again, according to this witness's

12  testimony, that Mr. Bao was managing the restaurant at or around

13  that time.

14          So the question is:  What happened next?

15          MR. STONE:  Okay.

16          THE COURT:  Because I don't want to skip all the way

17  to the end because my understanding, at least from yesterday

18  from Mr. Bao's testimony, was that he wasn't removed from the

19  bank account until after he left the restaurant, but there's

20  still a chunk of time in between.

21  Q.   During the time that Mr. Bao issued checks, did there come

22  a time when you had an issue with his issuing checks that you

23  learned from the bank?

24  A.   I am going to say no.  If I have maybe less than let's say

25  three or four, no more than ten.  Basically, I don't think so.

1  I get it because maybe some day -- I don't think so.  I'm not

2  going to say any checks, maybe single digit check.

3  Q.   Okay.  But did there come a time when you learned that

4  there were a series of checks that were returned?

5  A.   I don't know until the bank calls me on the 30 -- less than

6  30 days, I get 53 checks, all the employees' payroll bounced

7  back.  I paid I don't know how many thousands for the penalty.

8  Bank warning me, if you continue doing that, you are going to go

9  to black market.  What it means?  Just I put on a black market,

10 any bank don't do business with you.

11           THE COURT:  When was that, approximately, that you had

12 this notification from the bank about the 53 bounced checks?

13           THE WITNESS:  That is, you know, each check bounce

14 back.  The bank give me note the funds not enough.

15           THE COURT:  I'm sorry.  Say that again?

16           THE WITNESS:  Each check bounce back.  Bank told me

17 the funds not enough.  Reject funds back.  Come out, continue,

18 continue, continue coming.

19           THE COURT:  Okay.  So it was not all at once?  It was

20 over a period of time?

21           THE WITNESS:  Just less than 10 or 20 days.

22           THE COURT:  When was that, approximately?

23           THE WITNESS:  That's right before I let the plaintiff

24 go out of restaurant.  That's when I say, okay, I am done.  I

25 can't do that anymore because each time I get a fine, I have to

1  put the money.  That's the -- I used the money was called -- we

2  had it before.  Clean them out.  After let it go, still only

3  employed about like 40,000, that unpaid.  Because, you know, I

4  sorry, I say, a lot of people, you know, because the kitchen is

5  only here.  That's they wanted cash.  I have to bring the cash

6  one by one and give to them, and also I have to have about

7  $25,000 that checks was bounced from the bank.

8           Also, I have the vendor, about $90,000 statements for

9  the food isn't paid for.  That's the total added together over

10 300,000.  That's the money I was -- that time I used the money

11 or paid it out until today I owe nothing.

12 Q.   Did you discuss the bounced checks with Mr. Bao?

13 A.   I not sitting say the bounced check not accident.  Let's

14 say today I have the $2,000 credit come in, then the plaintiff

15 write him a check by himself.  Now he's the check first.  Like I

16 take out 19,000 -- 1,900 out first.  Then the rest the checks

17 give out to the employees.  Then the check says reimbursement.

18 Reimbursement, didn't have any support for reimbursement.

19 Didn't have any support of the tip out of that fit the check.  I

20 was pointed from the previous bank that much check write family,

21 write himself.  I told him, I said, by law, if they give

22 employee the tip, you have to evidence just with the receipt.

23 Each employee says, okay, this week I got $300 a tip.  If he

24 don't pay the tax, I have the record that people get the money,

25 right?  At down the road, people two years later say I got a

1  check -- I never get it.  You never paid me the tip.  I said,

2  that's really important.  You have to keep a record.  None.

3  Q.   Okay.  Did you explain that to Mr. Bao?

4  A.   A long, long time.  All the time.  I said, that's not

5  right.  You have a lot of people, even simple piece of paper,

6  right, I got 200, I got it 300.  And then stick the check in.

7  Q.   The checkbook that was -- so the receipts from the daily

8  receipts, who had the responsibility of collecting them and

9  depositing them?

10 A.   That's the whole upgrading he did it.

11 Q.   He did everything?

12 A.   Yeah.  I don't -- I don't have the sources to deposit the

13 checks.  I don't have -- no, I don't.  I never deposit only

14 single one.

15 Q.   So let's go back.  But did there come a time when you

16 decided that was it, that --

17 A.   I can't do it.

18 Q.   And you discussed that with him?

19 A.   I can't discuss it with him.  I just out.  Giving

20 investment because he is representative from Shanghai Speed.  He

21 didn't do great job.  I have to let him go because I have

22 supported all of this business, but that means -- now that means

23 Shanghai Speed loss is shareholder still there.  The particular

24 manager person have to go.

25 Q.   By the way, after he -- when did he -- when was he removed

1  from the restaurant?

2  A.   I can't remember.

3  Q.   What year?

4  A.   2019.

5  Q.   Okay.  And after he removed and your wife began the

6  management, did the business begin to improve?

7  A.   Other than Covid coming, yeah, but we actually is -- I am

8  lucky I have the great employees.  They all stayed with me.  Not

9  even single people left until today.  We do very good.

10 Q.   You are improving now?

11 A.   Yeah.  We can make some money.  My wife got paid for my

12 investment.  I never get any paid at all until my wife right now

13 getting paid.

14 Q.   During the time that Mr. Bao was there, did he take payroll

15 checks for himself?

16 A.   Yes.

17 Q.   Did you?

18 A.   I don't.

19 Q.   Did your wife?

20 A.   No.

21 Q.   So the only one while he was there that was receiving any

22 money in salary or draw was Mr. Bao?

23 A.   Both.

24 Q.   Oh, he and his wife?

25 A.   The plaintiff's wife and the plaintiff both take from

```
 1  there.
 2  Q.   Just to make it clear, you didn't object to that, did you?
 3  A.   No.
 4  Q.   You wanted him to make money there?
 5  A.   I just -- you know, family, what money he need it.  He need
 6  to support a family.  Anyway, just like, you know --
 7            THE COURT:  Hold on.  I mean, at that time, he was
 8  actually working there, right?
 9            THE WITNESS:  Yeah.
10            THE COURT:  And you weren't actually working there?
11            THE WITNESS:  Honestly, I not working, but the thing
12  is, you know, anything is broken, I have the 2 o'clock in the
13  morning ice machine is broken.  I have to go there.  I am not
14  like I said daily by daily work there.  I do some work.  I do
15  the work.
16            MR. STONE:  I don't want you to misunderstand.  We are
17  not flaunting it.
18            THE COURT:  Go ahead.  Next question.
19            MR. STONE:  I just want to make sure you know that
20  while he was --
21            THE COURT:  Next question.
22  Q.   Now, let's get back to the corporations.
23  A.   Uh-huh.
24  Q.   Because I want to make sure the judge understands.  So
25  Shanghai Speed is the company in China?
```

1  A.    Uh-huh.

2  Q.    And then you described the three other corporations?

3  A.    Uh-huh.

4  Q.    Correct?

5  A.    Uh-huh.

6  Q.    They were Sunwoo Management, Sunwoo Trade, and 506?

7  A.    Correct.

8  Q.    Okay.  Which of the corporations held the liquor license?

9  A.    Sunwoo Trade, Inc.

10 Q.    Okay.  Is a noncitizen allowed to hold a liquor license?

11 A.    I think so.

12 Q.    How about the SBA loan?

13 A.    I don't think so.

14 Q.    Did you have --

15         THE COURT:  Hold on.  Hold on.  I don't have the

16 realtime.  It's okay.  It's fine, but off the record.

17         (Discussion off the record)

18         THE COURT:  Let's go back on.

19         Mr. Stone, can you ask the question about the liquor

20 license once more?

21 Q.    In your understanding, is a non-U.S. citizen permitted to

22 hold an interest in a liquor license?

23 A.    Only U.S. citizen can hold a U.S. liquor license.

24 Q.    Now, number two, I want to go back to the loan that you

25 borrowed.  In addition to the security in the property, was it

1  necessary to also secure all of the personal property to secure

2  the loan?

3  A.   Let me clear.

4  Q.   You know what a UCC is, a UCC filing?  Do you know what

5  that is?

6  A.   Yes.

7  Q.   Did the bank take a security interest at all in the --

8  excuse me -- we call it FF&E, the furniture, fixtures and

9  equipment?

10  A.   Yes.

11  Q.   Okay.  In addition to that, did the bank require any one of

12  you to sign a personal guarantee?

13  A.   Yes.

14  Q.   Who had to sign the personal guarantee?

15  A.   Me.

16  Q.   Okay.  So that if this loan went bad, in addition to the

17  security, do you feel as though you would be responsible for

18  whatever deficiency there might be on the loan?

19  A.   Yes.  That's what I want to say.  If there is -- yes.

20  Q.   Okay.  In your understanding, is a non-U.S. citizen

21  permitted to guarantee a federally-guaranteed loan like an SBA

22  loan?

23  A.   That's do that once.

24  Q.   Okay.

25        THE COURT:  Hold on.  Go ahead.  Answer that.

 1              THE WITNESS:  U.S. citizen, yes.  You can apply the

 2  SBA loan.  Permanent resident, you can apply, but I don't know

 3  that they are going to approve or not.  If not U.S. citizen or

 4  resident, no.

 5  Q.   Okay.  So let's talk about Mr. Bao's immigration status.

 6       Do you know what his status is today?

 7              MR. SCHMIDT:  Objection, Your Honor.  Relevance.

 8              THE COURT:  Overruled.  If you know.  If you don't

 9  know, just say you don't know.

10              THE WITNESS:  I know.

11  Q.   You know?

12  A.   Yes.

13  Q.   Tell us.

14  A.   It's a particular name called "refugee protection."  Just

15  that means you back to your mother country, you get in trouble.

16  That's the U.S. protect them stay here, the visa on them.  I

17  don't know.

18  Q.   Were you familiar with the fact that Mr. Bao was processing

19  an application for a visa?

20              THE COURT:  At what time?

21  Q.   In or around 2016, when he came to the States, did he bring

22  to your attention that he was going to apply for a visa?

23  A.   Yes.

24  Q.   And did you assist him in either communicating with a

25  professional to handle the application?

1  A.    Yes.

2  Q.    And was that -- was that an attorney?

3  A.    Yes.

4  Q.    And were you going to charge Mr. Bao any money for

5  assisting him with that application?

6  A.    No.

7  Q.    When you sent him -- strike that.

8        When you provided him with the name of an attorney, did you

9  cooperate with him in supplying documents to the immigration

10 attorney?

11 A.    Honest is 80 percent document he provided to me or send it

12 direct to the lawyer.  The lawyer is Chinese.  He can speak

13 Chinese, so he replies in the email.  So on most of the time I

14 just tell them -- tell them I bought a restaurant, yes.  That's

15 all.  They connected doing that -- doing that.

16 Q.    Now, let's get back to the terms of the agreement because

17 that's very, very important.  So share with us each level of

18 what you perceive was the financial agreement between you and

19 Mr. Bao in this project, and do it one at a time so that it's

20 clear to Judge Krause.

21 A.    Let's clarify.  It's the Shuzhong Bao -- I always say

22 Shuzhong Bao.  That's the representative for Shanghai Speed.  I

23 represented -- I talk with him -- that means I talk to

24 represent -- I talk to Shanghai Speed because after me, his

25 father-in-law is majority owner, a majority shareholder and

1  general manager there.  So means we talk to Shuzhong Bao,

2  officer to Shuzhong Bao, that's officer to Shanghai Speed.

3  That's clear?

4  Q.  Yes.  I think you could be clearer.  What percentage of the

5  deal were you going to get, and what was he going to get?

6          THE COURT:  Well, hold on, Mr. Stone.  I think that's

7  what I think is not clear.  You keep referring in your

8  questioning of Mr. Stone to the percentage that Mr. Wang was

9  going to get versus the percentage that Mr. Bao was going to

10  get.  Mr. Wang's answer doesn't really ever seem to accept that

11  Mr. Bao, as an individual, was going to get anything.  He keeps

12  referring back to Mr. Bao as a representative of Shanghai Speed.

13          So I would like the question to be a little bit more

14  precise because if there is a distinction, which the witness

15  seems to be making, between the percentage that the company,

16  Shanghai Speed, should have had versus the percentage that

17  Mr. Bao as an individual should have had, I would like to hear

18  the witness's testimony about that.

19  Q.  The judge is asking you to further explain.  I am going to

20  ask you the same thing.  Can you explain the relationship

21  between you, Shanghai Speed, and Mr. Bao?

22  A.  Me with Shanghai Speed, I am majority, 51 percent majority

23  shareholder.

24  Q.  Okay.

25  A.  Yeah.  And Shuzhong Bao represented Shanghai Speed.  With

1  the Piermont deal, Shanghai Speed even he put about like on the

2  deal the 400-some thousand.  I responded along with still the

3  ownership of 50/50.

4          THE COURT:  Okay.  Now, when you say it's 50/50,

5  50 percent you?

6          THE WITNESS:  Fifty percent.

7          THE COURT:  And then 50 percent who else?

8          THE WITNESS:  Shanghai Speed.

9          THE COURT:  Okay.  So your position is that the

10  ownership of the Piermont deal, the property and the

11  restaurants, is 50 percent yourself as an individual, and then

12  50 percent Shanghai Speed?

13          THE WITNESS:  Correct.

14          THE COURT:  Okay.

15  Q.  And then the 50 percent that Shanghai Speed was going to

16  get, what percent -- what portion of that would go to the

17  benefit of Mr. Bao?

18  A.  I have to ask.  In the Shanghai Speed he owned 20 percent.

19  I don't know how to count that.

20  Q.  So the transaction between you and Shanghai Speed was

21  different than the terms between you and Mr. Bao, correct?

22          THE COURT:  I am going to object to that question

23  myself, Mr. Stone.  I mean, as this witness is testifying, at

24  least as I understand it, there was no term of agreement between

25  Mr. Wang and Mr. Bao as an individual.  His testimony seems to

1  be that the only agreement was between himself and Shanghai

2  Speed, the corporation, for which Mr. Bao was serving as a

3  representative because he was an employee, the deputy general

4  manager of Shanghai Speed.

5          But the testimony seems to be there was no independent

6  arrangement between Mr. Wang and Mr. Bao; is that correct?

7          MR. STONE:  Correct.

8          THE COURT:  So it's a little confusing in the

9  questioning when there are references to an agreement between

10 Mr. Wang and Mr. Bao because the only agreement with Mr. Bao was

11 in Mr. Bao -- according to Mr. Wang -- was in Mr. Bao's capacity

12 as a representative of Shanghai Speed.

13         So the only -- the only -- again, from Mr. Wang's

14 perspective, the only flow of funds that would go to Mr. Bao

15 would be whatever he would be entitled to as a shareholder of

16 Shanghai Speed; the same as Mr. Wang would be entitled to a

17 certain flow of funds as a shareholder of Shanghai Speed.

18         MR. STONE:  That's what he testified to.

19         THE COURT:  Okay.  But then we have to stop asking

20 questions about a deal between him and Mr. Bao because it's

21 confusing.  All right.  Next question.

22         MR. STONE:  All right.

23 Q.  Now, before this litigation started, were there

24 conversations between you and Mr. Bao before the litigation

25 started about what he was asking you to do with regard to

1  everything, the money that you received?  Do you understand that

2  question?

3  A.   I can --

4  Q.   Let me rephrase it, then.  Bear with me a second, Judge.

5       All right.  Do you know when the complaint in this case,

6  the date that it was filed?

7  A.   I think September 2019.  I don't know exactly.

8  Q.   Let me show it to you.

9            THE COURT:  I think we can take judicial notice of the

10  fact that it was filed in late August, early September of 2019.

11           MR. STONE:  It was filed actually on August 28th,

12  Judge.  Okay.

13           THE COURT:  Fine.  August 28, 2019.  You were very

14  close.  Just off by three days, four days.

15  Q.   Prior to that date, before the lawsuit was filed, did you

16  receive a communication by that WhatsApp from Mr. Bao?

17           THE COURT:  WeChat.

18           MR. STONE:  What's it called?

19           THE COURT:  WeChat.

20           MR. STONE:  WeChat.  Okay.  Forgive my ignorance.

21           THE COURT:  That's okay.

22  Q.   Did you receive a communication through WeChat from Mr. Bao

23  attempting to --

24           MR. SCHMIDT:  Objection.  Leading.

25           MR. STONE:  Okay.

```
 1          THE COURT:  Sustained.
 2  Q.  Did you receive any communication prior to the filing of
 3  the complaint from Mr. Bao?
 4  A.  I can't remember.
 5  Q.  Did you -- can I show you something to refresh your memory?
 6          THE COURT:  You can show him a document that's in
 7  evidence.  I think we are talking about documents that are in
 8  evidence.  You can just show it to him.
 9          MR. STONE:  This is in.
10          THE COURT:  Exhibit?
11          MR. STONE:  Exhibit N.
12          THE WITNESS:  Okay.
13          THE COURT:  Hold on.  You can go back.
14          Mr. Stone has shown or is showing the witness a
15  document that has previously been admitted in evidence as
16  Plaintiffs' Exhibit N.  It's a three-page document.
17          THE WITNESS:  Okay.
18          THE COURT:  Four pages with the translation at the
19  end.  Do you have four pages, Mr. Wang?
20          THE WITNESS:  I have more than that.  One, two,
21  three -- yeah.  I believe it is like a four page.
22          THE COURT:  You have a whole lot of stuff there.  Hold
23  on.  Can I see?
24          THE WITNESS:  (Indicating)
25          THE COURT:  Off the record.
```

1          (Discussion off the record)

2          THE COURT:  Mr. Stone, there is a whole lot of stuff

3    here, some of which is not part of Exhibit N.

4          MR. STONE:  I think I pulled that out of my binder.  I

5    actually only need page 1, Judge.

6          THE COURT:  Okay.  I can't reliably say which of these

7    documents in Chinese are part of this.  That's Exhibit N.  The

8    witness now has in front of him what's been marked as

9    Plaintiffs' Exhibit N.

10         The rest of this stuff you can take back at another

11   time, Mr. Stone.

12   Q.   Okay.  So let's start first, Mr. Wang, what is the date of

13   that document?

14   A.   July 27, 2019.

15   Q.   Okay.  Did you -- when you received that document, did you

16   review the chart that was submitted by Mr. Bao?

17   A.   Yes.

18   Q.   And can you explain to the judge what he was -- what he

19   laid out for you and what your response was to receiving that

20   document?

21   A.   Okay.  The document --

22         THE COURT:  Let me just ask you a preliminary

23   question.  There is testimony yesterday, and maybe on Monday as

24   well, that this document was transmitted by Mr. Bao to his

25   sister.  Did you, yourself, Mr. Wang, ever receive this from

X. Wang - Direct - By Mr. Stone

 1  your wife?

 2          THE WITNESS:  Yeah, my wife show me.

 3          THE COURT:  Okay.  Very good.  Then proceed.

 4          MR. STONE:  Okay.  So --

 5          THE COURT:  So Mr. Stone asked you to describe what

 6  your response was to this document after you received it.

 7  Q.   Did you respond to your brother-in-law about that document?

 8  A.   No.

 9  Q.   And did you ever agree to sign that document?

10  A.   No.

11  Q.   And can you tell the Court why -- strike that.

12       Do you agree with the manner in which the division of

13  contributions were to that document?

14  A.   Yes, I can.  You know, the only the true things he is

15  listed Shanghai Speed is $600,000 invest the restaurant.  That's

16  true.

17          THE COURT:  Okay.

18          THE WITNESS:  Yes.  And but as I not sign, this loan

19  amount not 1.2.

20          THE COURT:  Can I ask you a question?  Are you looking

21  at the chart?

22          THE WITNESS:  Yes.

23          THE COURT:  In the column on the left side of the

24  chart where it says "shareholder," the far left?

25          THE WITNESS:  Yes.

1          THE COURT:  First one, first line is you, Mr. Wang and

2   your wife, Ms. Bao, right?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  The next line it says Mr. Bao, the

5   plaintiff and his wife, Ms. Zeng.

6          THE WITNESS:  Uh-huh.

7          THE COURT:  Right?

8          THE WITNESS:  Yes.

9          THE COURT:  It doesn't say Shanghai Speed anywhere on

10  there.

11         THE WITNESS:  Yeah, but I was only think about that;

12  that he is the founder of Shanghai Speed because he was my

13  founding majority owner after me.

14         THE COURT:  Okay.

15         THE WITNESS:  Okay.  Let's say -- that's Shuzhong Bao.

16  Let's put all his money in the form.  Let's say he say, on the

17  July 27, $600,000, right?  On the September -- August 28, he put

18  him in a law court -- lawsuit he come now 175,000.  That's only

19  take a couple of days later.  I don't know where the money come

20  from.

21         THE COURT:  Okay.  But that's a whole separate set of

22  issues perhaps, but here -- here the question is:  Why didn't

23  you want to sign this document when it was 600,000?  That was

24  what Mr. Stone asked you, and I think you were about to answer

25  that.

1  Q.   Okay.  So why wouldn't you sign -- just like the judge

2  asked -- why didn't you sign the document that Mr. Bao sent to

3  your sister without sending it to you?

4  A.   I say two reasons.  One reasons is didn't say Shanghai

5  Speed.  If I get an authorization tell me it representative I am

6  signing, and also loan amount not right.

7          THE COURT:  When you said the loan amount is not

8  right, what do you think the loan amount should have been?

9          THE WITNESS:  Loan amount is outside of 1.36.  That's

10  on the closing document.

11          THE COURT:  Okay.

12          THE WITNESS:  Yeah.

13  Q.   And that loan document, which you just explained to Judge

14  Krause, was personally guaranteed by you and secured by the

15  investment?

16  A.   Yes.

17  Q.   Okay.  Now, but before you got the lawsuit --

18  A.   Uh-huh.

19  Q.   -- did you have any other conversations with Mr. Bao like

20  trying to resolve this matter?

21  A.   I pretty much we -- yes, we do.

22          MR. STONE:  Well, let's talk about the phone call

23  of -- and this is I am referring to Defendant's Exhibit, Judge,

24  as you know, FF, FF.  That's the --

25          THE COURT:  Also known as the Plaintiffs' Exhibit T.

1  You are talking about the phone call of September 11th, 2019?

2            MR. STONE:  Yep.

3            THE COURT:  Well, that was after the lawsuit was

4  filed.

5            MR. STONE:  Okay.

6            THE COURT:  But yes, I have Plaintiffs' Exhibit T in

7  front of me.

8            MR. STONE:  Okay.  Before we get to that, I would like

9  to approach, Your Honor, and show him Defendant's Exhibit JJ.

10 That's the borrower agreement $270,000.

11           THE COURT:  That's in evidence also as Plaintiffs'

12 Exhibit L.

13           MR. STONE:  Do you have it, Your Honor?

14           THE COURT:  Yes.

15 Q.   Okay.  Do you recognize that document, Mr. Wang?

16 A.   I can't remember.

17 Q.   Is this the document that Mr. Bao provided to you asking

18 that you sign it and in regard to making --

19           MR. SCHMIDT:  Objection.

20           MR. STONE:  -- a 250 --

21           MR. SCHMIDT:  Objection.

22           THE COURT:  Sustained.

23           MR. STONE:  I will rephrase it.

24 Q.   Take a look at that and tell me whether or not you have

25 seen this document before.

1  A.   2017?  Maybe.

2  Q.   I didn't hear what you said.

3          THE COURT:  He said "Maybe."

4          Mr. Wang, do you recall that at some -- at some point

5  in 2018, I know the dates -- forget about the dates that are

6  written on here.  Do you recall sometime in 2018 receiving two

7  different documents from Mr. Bao that were described as

8  "borrowing agreements" where Mr. Bao asked you to sign the

9  agreements essentially committing to repay certain money to him?

10         Do you recall receiving two agreements or draft

11 agreements like that?

12         THE WITNESS:  That's that one?

13         THE COURT:  This is one of them.

14         THE WITNESS:  Yeah.  Where the other one?

15         THE COURT:  And the other one, the other part of

16 Plaintiffs' Exhibit L.

17         MR. STONE:  That is JJ2.

18         THE COURT:  Which was in the amount of $600,000.

19         THE WITNESS:  Yes.

20         THE COURT:  You recall receiving those from Mr. Bao?

21         THE WITNESS:  Yes.  Yes.

22         THE COURT:  Okay.

23 Q.   Did you ever sign the document?

24 A.   No.

25 Q.   Can you explain to the judge why?  Let's talk about the

1  $270,000.  Did you ever ask Mr. Bao to put into the business an

2  additional $270,000?

3  A.   No.

4  Q.   Did you even know that he was putting the money in?

5  A.   No.

6  Q.   Did you know whether or not he wrote checks drawing that

7  money out?

8  A.   No.

9  Q.   Did you ever receive any of the $270,000?

10  A.   I, no.

11  Q.   Was the $270,000 ever part of this deal from Shanghai

12  Speed?

13  A.   I don't know.

14  Q.   Do you know the source of the $270,000?

15  A.   I don't know.

16  Q.   Do you know where the $270,000 went once it got into the

17  account, what was removed from the account?

18  A.   I don't know, but I didn't take any.

19  Q.   You didn't get any of this money?

20  A.   No.

21          THE COURT:  Hold on.  Hold on.  Hold on.

22          There's been evidence introduced that the money was

23  moved into the Sunwoo Trade corporation account.  Your question

24  just now had something to do with money being removed from that

25  account.  Is there any evidence in the record about the money

1  being removed from that account?

2          MR. STONE:  Not by me.

3          THE COURT:  I know.  So the last question where you

4  included in the question something about the money being removed

5  from the account lacks foundation.  There is no evidence in the

6  record that the money was removed from the account.  Maybe it

7  was or maybe it wasn't, but I don't have any evidence of that

8  one way or the other.

9          MR. STONE:  Yeah, but he is testifying -- he just

10 testified he never got any of that money.

11         THE COURT:  I heard that testimony.  But the question

12 itself assumed facts that are not in evidence.  There could have

13 and should have been an objection to that question, but again,

14 since I am trying to keep the record straight, I -- we can --

15         Mr. Wang, were you aware at any point that Mr. Bao

16 transferred money, approximately $267,000, into bank accounts

17 that were in the name of Sunwoo Trade, Incorporated?

18         THE WITNESS:  Because there is the money tracing for

19 kind of period, I can't say I know exact amount, but I know has

20 some money into it.  I don't sign the paper because the money go

21 to Sunwoo Trade, Inc.  I don't take out.  I don't know he take

22 out or not.  If not, the money is going toward expenses for the

23 restaurant.  If the money spent expensing the restaurant, why I

24 have to pay for?  That's the reason I don't sign it.

25         THE COURT:  And your testimony is that you never asked

1    Mr. Bao to put additional money from his account into the Sunwoo

2    Trade, Incorporated account?

3            THE WITNESS:  I never asked him.

4            THE COURT:  Do you know why he -- there are bank

5    records that are in evidence in this case that seem to indicate

6    that a substantial amount of money was transferred from

7    Mr. Bao's account or an account -- bank account that was in his

8    name personally to the account of Sunwoo Trade, Incorporated.

9            Do you have any idea why that money was transferred

10   there?

11           THE WITNESS:  I don't want to take a guess.

12           THE COURT:  Don't guess.  If you don't know, you don't

13   know.

14           THE WITNESS:  I don't know why the money go to the

15   restaurant.

16           THE COURT:  All right.  We are going to take a

17   five-minute break.

18           (Recess)

19

20

21

22

23

24

25

```
1                      INDEX OF EXAMINATION

2

3   Examination of:                        Page

4   XUGUANG (JASON) WANG

5   Direct by Mr. Stone........................263

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```